# Richmond

ENTERPRISE THEATRE CORPORATION v. E. J. STUTZ.

January 15, 1931.

Present, Prentis, C. J., and Holt, Epes, Hudgins and Browning, JJ.

*James P. Hart, Jr.,* and *T. W. Messick,* for the plaintiff in error.

*T. X. Parsons,* for the defendant in error.

EPES, J., delivered the opinion of the court.

E. J. Stutz instituted his action by notice of motion for judgment in the Law and Chancery Court of the city of Roanoke against Enterprise Theatre Corporation seeking to recover the sum of $10,000, with interest from January 1, 1929, which he claims to be due him from said corporation for the breach of a written contract which reads as follows:

"Know all men by these presents: That we, the undersigned, for and in consideration of the services rendered and to be rendered to us by Emanuel J. Stutz, in connection with procuring, promoting, and assisting in financing a theatre to be operated by Loew's, Incorporated, or a subsidiary corporation, on the property of the undersigned on Salem avenue, with an entrance thereto on Campbell avenue, in the city of Roanoke, Virginia, are indebted to said

Emanuel J. Stutz in the sum of $5,000 cash, to be paid to him within thirty (30) days after the completion of the said theatre, on demand, and we, the undersigned, hereby bind ourselves, and agree to deliver to said Emanuel J. Stutz, in further consideration of the services rendered by him, two hundred and fifty (250) shares of the common stock of the Enterprise Theatre Corporation, said 250 shares being a part of the whole issue of 2,500 shares of common stock to be issued by said corporation, and said 250 shares to be delivered to said Emanuel J. Stutz immediately after the authority to issue said stock is granted by the said Corporation Commission, and not later than sixty (60) days from the date hereof.

"It is understood and agreed that in the event the undersigned do fail to complete the said theatre as above contemplated, then, and in that event, it is agreed by and between the Enterprise Theatre Corporation and Rosenberg Brothers, whose names are signed hereto, and Emanuel J. Stutz, that the undersigned hereby covenant and bind themselves to pay to the said Emanuel J. Stutz the sum of ten thousand ($10,000) dollars, which shall be liquidated damages for their failure to build said theatre as agreed.

"The undersigned covenant and agree to begin work on plans, etc., of said theatre at once, and have the same completed for occupancy by the first (1st) of January, 1929.

"Witness the following signatures and seals, and the signature of the Enterprise Theatre Corporation, by its president, and the common seal of said corporation duly affixed and attested by its secretary, this the 5th day of December, 1927.

"......................... (Seal)
"......................... (Seal)
"......................... (Seal)
"......................... (Seal)
"......................... (Seal)
"ENTERPRISE THEATRE CORPORATION,
"(Corporate seal)      "By SOL ROSENBERG, *President.*

"Attest:

"JAMES P. HART, *Secretary*.

"In consideration of the sum of $5.00 cash in hand paid, the receipt whereof is hereby acknowledged, and the further consideration of the execution of the foregoing agreement, I hereby agree to accept the terms thereof.

"Witness my hand and seal this the 5th day of December, 1927.

"EMANUEL J. STUTZ (Seal)

"It is further understood and agreed between the parties hereto that the said Emanuel J. Stutz from this date on, while working for the Enterprise Theatre Corporation, shall receive the sum of thirty-five dollars per week for expense account and in addition thereto all traveling expenses while on business for said corporation. The above amount being in addition to the five thousand dollars already stipulated above.

"ENTERPRISE THEATRE CORPORATION,<br>"SOL ROSENBERG, <em>President</em>.<br>"JAMES P. HART, <em>Secretary</em>.

"(Corporate seal)."

The said notice sets forth said contract in full, and alleges that Stutz "has done everything and performed all of the obligations required by said contract;" but that the defendant has failed to build or complete said theatre as agreed, and has become obligated to pay to said plaintiff the $10,000 liquidated damages specified in said contract.

On July 17, 1929, the defendant filed its plea of *non est factum;* and on August 2, 1929, defendant filed its grounds of defense, which are as follows:

"1. That the contract as set forth in the notice of motion was never agreed upon, and hence, there being no meeting of minds, was not a valid and subsisting contract.

"2. That had the contract been properly signed and agreed upon, there has not been sufficient performance on the part of the plaintiff to warrant recovery on the contract."

On September 24, 1929, the defendant filed a plea setting up the defense that the instrument sued on "shows on its face that Rosenberg Brothers were intended parties thereto and necessary parties to the completion of the contract, and that the said Rosenberg Brothers did not sign said contract and hence said contract is an incompleted contract which cannot be made the basis of this action."

On September 24, 1929, the defendant also filed further grounds of defense, which are below set forth at length (italics ours):

"1. That the alleged contract shows on its face that parties other than the defendant were parties to the contract; that they never signed or executed the same, and that though signed by officers of the defendant corporation and though the seal is attached, the contract was left in the hands of the president of the corporation without the seal on same, and that the said seal has since been placed on the contract by some means unknown by some person or persons unknown to the officers of the defendant corporation, and without any authority to do so, and said contract was never delivered to the plaintiff.

"2. That the said plaintiff represented to the defendant that he could finance a proposed theatre building and could procure a satisfactory lease thereof with *Marcus Loew Booking Agency*, using the lease signed by *Marcus Loew Booking Agency* as a means of financing the enterprise, if the Rosenberg Brothers would purchase a suitable site for such building in the city of Roanoke.

"The defendant would further say that Rosenberg Brothers out of their own funds purchased said site and looked to said plaintiff to finance their proposition in the

undertaking of which said plaintiff wholly failed and refused and likewise failed in procuring a satisfactory lease with *Marcus Loew Booking Agency* so that the project was ultimately abandoned, and defendant owes the plaintiff nothing."

Issue was joined on the defenses set forth in said pleas and grounds of defense. The case was submitted to the jury which returned a verdict for the plaintiff for $10,000, upon which verdict the court entered judgment. From this judgment the Enterprise Theatre Corporation has been granted a writ of error.

There is no material conflict in the testimony as to the following facts: The plaintiff, E. J. Stutz, of Washington, D. C., was engaged in the business of operating and promoting theatres and had a business acquaintance with Mr. Marcus Loew, the president of Loew, Incorporated, and some of the other officials of this corporation and its subsidiaries.

Loew, Incorporated, is a corporation which either directly, or through subsidiary corporations owned by it, is engaged in the production, distribution and showing of moving pictures. Among the subsidiary companies of Loew, Incorporated, is Marcus Loew Booking Agency, a corporation engaged in the business of managing, booking and directing theatres throughout the United States.

Rosenberg Brothers consisted of Sol Rosenberg, Lake Rosenberg, and their three other brothers, the five being engaged as partners in the clothing business in Roanoke, under the firm name of "Oak Hall, M. Rosenberg and Sons," for whom Sol Rosenberg was the spokesman.

In the spring of 1927 Stutz learned that the Rosenberg Brothers were desirous of building a theatre on some land in Roanoke, Virginia, which was owned by them. Stutz went to Roanoke and there met and had an interview with "Lake Rosenberg and Sol Rosenberg and several Rosenberg

brothers," with reference to their building and operating a theatre on said land. In this interview the Rosenbergs said that they did not want to make a mere lease of the theatre, should they build it, but wanted "to get in on the profits."

Stutz explained to them that the only way for them to do this was for them to go into the moving picture business themselves, build the theatre, and get some big company to operate it for them; and the Rosenbergs told Stutz to see what he could do along this line.

Stutz then went to New York and had an interview with Marcus Loew, president of Loew, Incorporated, and in the light of that interview came back to Roanoke and proposed to the Rosenbergs that they organize a corporation to build and equip said theatre, and then turn it over to Loew, Incorporated, to operate for them.

This plan met with the approval of the Rosenberg Brothers, and they made a verbal agreement with Stutz to assist them in carrying it out. The only testimony in the record as to the terms of this verbal agreement is that of Sol Rosenberg. His testimony on this point is to the effect that its provisions were essentially the same as those contained in the first paragraph of the writing here sued upon, except that the understanding was that the corporation to be procured to operate the theatre was Loew, Incorporated, or a *"substantial"* subsidiary corporation thereof.

Working under this verbal agreement, Stutz got the officials of Loew, Incorporated, interested in the proposed plan, and got Milburn-Heister and Company, architects of Washington, D. C., to prepare preliminary plans and specifications which were submitted to and approved by the proper officials of Loew, Incorporated.

During the summer of 1927, the Rosenbergs, with the active assistance of Stutz, carried on negotiations with the

officials of Loew, Incorporated, with reference to the building and operation of said theatre. Finally, under date of August 19, 1927, the legal department of Loew, Incorporated, submitted to Sol Rosenberg, through Mr. Hart, the attorney for the Rosenbergs, a "revised draft or proposed booking agreement to be entered into by the *Marcus Loew Booking Agency* with Sol Rosenberg."

The first paragraph of said proposed agreement reads: "*Agreement* made this .... day of August, 1927, by and between *Sol Rosenberg* of Roanoke, party of the first part, hereinafter designated as the 'owner,' and *Marcus Loew Booking Agency*, a domestic corporation * * *, party of the second part, hereinafter designated as the 'agency'."

The proposed contract is long and goes into many details. Briefly stated it provided as follows: Sol Rosenberg is to build and equip said theatre. Marcus Loew Booking Agency is to have the exclusive right to manage, book and direct the policy of the theatre for twenty years. So long as the provisions of the contract are complied with, the name "Loew" may be used in the name of the theatre. Marcus Loew Booking Agency is to receive fifty per cent of the net profits for its services. The net profits are to be computed by deducting from gross receipts the cost of operations and certain sums allowed to the owners of the theatre for rent and taxes. Sol Rosenberg agrees to pay the agency on demand the weekly deficits between receipts and operating expenses.

The proposed contract further provides that Sol Rosenberg "will immediately cause to be organized a corporation under the laws of the State of Virginia with sufficient capital to acquire the aforesaid property owned in fee, and the lease of the theatre entrance hereinbefore mentioned, together with the option to purchase, and upon the organization of said company and the acquisition by it of the aforesaid property and lease, the said corporation shall

execute an agreement in writing in form approved by the agency," assuming the terms and conditions to be kept and performed by said Sol Rosenberg; but that such assent shall not release Sol Rosenberg from any of the covenants agreed to be performed by him under the contract.

Upon the receipt of the revised draft for the proposed contract, Sol Rosenberg, under date of August 23, 1927, wrote Milburn-Heister and Company, the architects, sending them a copy of said proposed contract. In the postscript of this letter he says: "The copy of herewith contract is in dummy form, with no objections by us except it will be made out with the new company charter applied for."

Soon after this the Enterprise Theatre Corporation was chartered for the purpose of acquiring the necessary land and building and equipping the proposed theatre. The Rosenberg Brothers were the incorporators and were named as directors in the certificate of incorporation. Sol Rosenberg was named in said certificate as president and Mr. James P. Hart, their attorney, as secretary. Mr. Hart, however, had no financial interest in the corporation. The record does not show that any formal subscriptions to the common stock of the corporation, which alone had voting power, were executed, but it was understood that all the voting stock, except that to be given Stutz, was to be held by the Rosenberg Brothers.

At the request of the Rosenbergs, Stutz then endeavored to sell some of the preferred stock of the corporation; and prior to December 5, 1927, did procure several subscriptions on forms which the Rosenbergs prepared and gave to him to be used for that purpose. All of these forms for subscription contracts state that the theatre to be built by the corporation "shall be operated by Loew, Incorporated, or a subsidiary of said Loew, Incorporated."

On December 5, 1927, the contract here sued upon was drawn up in Roanoke, in the office of Mr. James P. Hart,

the attorney for and secretary of the Enterprise Theatre Corporation. Mr. Hart dictated the main portion of the contract to his stenographer from notes which had been prepared by Stutz; but the addenda covering the item of Stutz's expenses was not covered by these notes. Sol Rosenberg and Stutz were both present while the contract was being dictated. When it had been typed, Sol Rosenberg then and there, as president of the corporation, signed its name to the contract in the two places in which it appears, and Mr. James P. Hart, as secretary of the corporation, affixed his signature in the two places in which it appears.

Thus far there is no material conflict in the testimony. But there is a most material conflict in the testimony as to when and by whom the seal of the corporation which appears in two places on the contract was affixed, and as to whether the contract was ever delivered to Stutz.

Stutz testified that Mr. James P. Hart affixed the seal of the corporation to said contract in his office at the time he signed the contract as secretary; that Mr. Hart then handed the contract to him (Stutz); that there were no conditions attached to the delivery thereof to him; that he and Sol Rosenberg went from Mr. Hart's office to "Oak Hall," the store of Rosenberg Brothers, and there Sol Rosenberg said, in the presence of Lake Rosenberg and Mrs. Sol Rosenberg, that Stutz was now on the pay roll of "Oak Hall;" that the reason that the Rosenbergs individually were made parties to said contract was that he was trying to get additional security by having them made parties to the contract; and that the reason the Rosenbergs did not sign it as individuals was that when he found that the land or some of the land on which it was proposed to build said theatre was vested in the Enterprise Theatre Corporation and not in the Rosenbergs, he "did not care" whether they signed it or not.

The testimony of Sol Rosenberg is to the effect that he

read said contract over hurriedly and told Stutz he thought it was all right; that he signed it in Mr. Hart's office, but that at the time he told Stutz that he signed it "with the provision that my brothers are satisfied;" that the seal of the corporation was not affixed to it in Mr. Hart's office the day it was written and signed, and that it "never was sealed;" that Mr. Hart did not give Stutz this paper the day it was written, but that it was given to him, Sol Rosenberg, and that he had it in his hand when he walked out; that it never was delivered to Stutz but was placed in Sol Rosenberg's office "in a pack of stuff" that Stutz had access to; that until a short while before this suit was brought he did not know that Stutz had it in his possession, but thought that it was among his own files; and that his brothers would not sign it. No mention is made by Sol Rosenberg that there was any understanding when he signed said contract that it was not to become operative until it had been authorized in a corporate meeting to be held that afternoon, as Mr. Hart later testified.

On cross-examination, in reply to the question: "Was there any reason why you would not give Stutz a copy of the contract?" Sol Rosenberg testifies as follows:

"A. Yes, sir. Because my brothers had called my attention to the clause which wasn't in accord with our agreement. There was a clause which wasn't in accordance with our verbal agreement.

"Q. Will you please take that contract and point out what was in there that was at variance with the previous verbal agreement with Stutz?

"A. Well, I can point out to the jury this part, 'to be operated by Loew or a subsidiary corporation that is substantial.' 'That is substantial'—that ain't in there. That's out. What good would it do us to have a corporation that wasn't substantial?

"Q. Well, go ahead and give the next variance.

"A. I didn't agree to the second paragraph in there" (*i. e.*, the paragraph with reference to the payment of liquidated damages).

Mr. James P. Hart, the secretary of the defendant corporation, called as a witness by the defendant, testified that there were three copies of the contract made; that he did not affix the seal of the corporation to the contract at that or any other time; that the seal of the corporation was kept by Sol Rosenberg and was not in his (Hart's) office; that he did not deliver this contract to Stutz, but gave all three copies of it to Sol Rosenberg, who took them out of his office in his hand; and that he (Hart) signed the contract because "they were in a hurry," but that the understanding was that a meeting would be held that afternoon and that the paper "would not be operative until they all passed upon it and the minutes were written up and signed by the proper officers, and a waiver written up and signed;" that the "Rosenbergs were to sign it," and that "it was subject to their approval."

Sol Rosenberg, Lake Rosenberg and Mrs. Sol Rosenberg all deny that Sol Rosenberg made the statement to Lake Rosenberg and Mrs. Sol Rosenberg that Stutz was now on the pay roll of "Oak Hall." But the undisputed evidence is that for some months, beginning December 5, 1927, Stutz was paid by the Rosenbergs $35.00 per week for his expenses and in addition to this his traveling expenses while on the business of the corporation. There is no evidence that prior to December 5, 1927, he had been paid any sum for his expenses. There is no material conflict in the evidence as to what took place after December 5, 1927.

On December 7, 1927, the Enterprise Theatre Corporation entered into a written contract with Milburn-Heister and Company to complete the tentative plans and specifications for said theatre building and for their services as architects in and about the construction thereof.

Stutz continued to render active service in connection with the promotion and financing of building and equipping of said theatre and in connection with procuring Loew, Incorporated, or a subsidiary corporation thereof, to operate it. Among other things he made several trips to New York to see the officers of Loew, Incorporated, with reference to these matters, and he procured some additional subscriptions to the preferred stock of the corporation.

Between December 1927 and March 1928, Stutz was engaged principally in devising plans for financing the corporation and in procuring some person or persons who would furnish the money required to acquire the necessary land and to build and equip the proposed theatre. Finally he got S. D. Ferguson, E. M. Funkhouser and D. M. Taylor, of Roanoke, to agree to lend the Enterprise Theatre Corporation $500,000 to be used for the purchase of the necessary land and for building and equipping said theatre. This proposed plan for financing the corporation he submitted to the officers of Loew, Incorporated, and procured their approval of it. Formal written contracts dated March 3, March 6 and March 20, 1928, were then entered into between the Enterprise Theatre Corporation and said S. D. Ferguson, E. M. Funkhouser and D. M. Taylor under which said individuals agreed to lend sums aggregating $500,000 to the Enterprise Theatre Corporation, the same to be secured by deeds of trust on the property of the corporation and certain other property belonging to M. Rosenberg and Sons, Inc.

The contracts dated March 6 and March 20, 1928, expressly referred to the fact that an operating contract was to be entered into between Enterprise Theatre Corporation and *Marcus Loew Booking Agency* for the operation of the theatre to be built.

When these financial arrangements had been made and the plans and specification completed, bids for the con-

struction of the theatre were advertised for. These bids were opened at the Oak Hall store of the Rosenberg Brothers in Roanoke, in April, 1928. The Rosenbergs, Stutz, Mr. Shiller, vice-president of Loew, Incorporated, and Messrs. Ferguson and Funkhouser were present when the bids were opened. The low bid was less than the sum contemplated when said financial arrangements were made.

Stutz then took the bids and the contract of said bankers agreeing to make said loans to New York city, and left them at Mr. Shiller's office; and arranged with Mr. Shiller to notify Mr. Rosenberg when the Loew people and the Rosenbergs could get together to close the deal.

Mr. Shiller came to Roanoke on May 29, 1928, and after going over the proposition with the Rosenbergs called for a World-News reporter and there gave the reporter a news story saying "that the theatre was to be built; that Loew was coming into Roanoke, describing the proposition and saying that work would commence within thirty days." Mr. Shiller then told the Rosenbergs that he was going to New Orleans, but would return to New York in two weeks, when he would notify the architects and Rosenberg to come to New York to make final arrangements to start work.

The testimony for the plaintiff is to the effect that on the 13th of June Mr. Sol Rosenberg, at the request of Mr. Shiller, went to New York and there, on the 14th of June, without Stutz or the architects, without the knowledge or consent of Stutz, procured an agreement from the Loew people releasing unconditionally the Rosenbergs and the Enterprise Theatre Corporation from any moral or legal obligation on the part of the Rosenbergs or the Enterprise Theatre Corporation to build said theatre.

With reference to the abandonment of the proposition upon which Stutz was working for them, and the release of the Loew people, Sol Rosenberg testified as follows on cross-examination:

"Q.  He (Stutz) continued to work on this proposition from December until the time it fell through, didn't he?

"A.  I don't know how long after that he worked.  He had done a lot of work on it before that.  I couldn't say.

"Q.  It was the following June that you released Loew?

"A.  I don't recall.  He released me more than I released him.  It was a moral matter between us.  I couldn't do anything with Loew.  I wanted not to be morally bound to him, so we could work with some other company, as we are now."

When asked on direct examination: "Tell us why you did not consummate the deal of borrowing money from Messrs. Ferguson and Funkhouser," Sol Rosenberg replied as follows:

"A.  In the first place, Loew and Company wouldn't make a contract with the name Loew and Company on it, which is a corporation worth, I suppose, $100,000,000. They wanted to have a deal with us in the name of Loew Booking Agency—just a manager-director company, with no capital paid in and no responsibility.  That was one reason.  The second reason was that the Loew Booking Agency were not going to be responsible to me for any possible loss that might happen to take place in this theatre here in Roanoke.  They made an arrangement not agreed to by my brothers nor by me.  They made an arrangement that we were to get half the profits after the deduction of ten per cent on the cost of the building and equipment and six per cent on the cost and valuation of the land—we was to get half the profits after that and Loew and Company was to get the other half, and in case there wasn't enough profits to pay the ten per cent on the building and equipment, and six per cent on the land, we personally had to be responsible for this loss—all of it.  Not half of it, but all of it, in case they didn't take in enough.  If they had lost $10,000 a week, we would have had to pay it all, and that was

distasteful to my brothers and my associates and finally got distasteful to me. In connection with the amount we were to borrow from the financiers, Mr. Funkhouser and Mr. Ferguson and Mr. Taylor, Mr. Funkhouser and Mr. Ferguson and Mr. Taylor demanded that we go to work and reimburse them with a piece of property not connected with the theatre at all—with a piece of property owned by the Rosenberg Brothers and not intended to be put in with the Enterprise Corporation. That was the demand of Mr. Ferguson and Mr. Funkhouser and Mr. Taylor."

Upon cross-examination Sol Rosenberg also testified as follows when being questioned about the said draft for a proposed contract between Sol Rosenberg and Marcus Loew Booking Agency, a copy of which was sent by him to Milburn-Heister and Company on August 23, 1927:

"Q. This contract here was submitted to you, and sent by you to Mr. Milburn, wasn't it?

"A. Yes, I suppose so.

"Q. And is not that contract there in the name of Marcus Loew Booking Agency?

"A. Yes, sir.

"Q. And didn't you say on the bottom of this" (*i. e.*, the letter to Milburn-Heister and Company): " 'The copy of herewith contract is in dummy form, with no exceptions by us except it will be made out with the new company charter applied for?'

"A. Yes, sir; that is all right, and —

"Q. Then why didn't you say something then about not wanting to do business with the Marcus Loew Booking Agency?

"A. I didn't say that, and don't say it now. I said their responsibility was not the most part; the disagreement, arising after this, was that I wouldn't be responsible for all their losses.

"Q. Well isn't that in there, Mr. Rosenberg?

"A.  That is all right, but we hadn't signed it."

The foregoing statement of facts and excerpts from the testimony are sufficient for the comprehension of the questions raised in the several assignments of error here made, and the decision thereof.

The first assignment of error is that the court erred in permitting the plaintiff to introduce in evidence the contract here sued upon.  The contention of the defendant in error is that the contract is incomplete on its face in that it shows that it was intended that it should be signed by the Rosenberg Brothers as well as by the Enterprise Theatre Corporation; and that as a matter of law until so signed it is not a valid instrument binding upon the corporation.

This assignment of error is not well made.  *Ward* v. *Churn*, 18 Gratt. (59 Va.) 801, 98 Am. Dec. 749; *Kyger* v. *Sipe*, 89 Va. 507, at p. 511, 16 S. E. 627; *Turnbull* v. *Mann*, 99 Va. 41, 37 S. E. 288.

The law on this subject is so well stated in *Ward* v. *Churn*, 18 Gratt. (59 Va.) at p. 808, *et seq.* 98 Am. Dec. 749, that it requires no restatement thereof.  In that case Joynes, J., in delivering the opinion of the court says:

"The question then arises, whether the fact that a deed or bond in the hands of the grantee or obligee indicates, on its face, that it was intended that others should execute it besides those who did execute it, is sufficient of itself to raise a presumption that it was delivered upon a condition that the parties who executed it should not be bound until it should be executed by the other parties named in it.  *  *  The face of the paper in such a case affords evidence of the most satisfactory character of an original intention or expectation that it was to be executed by all the parties named in it.  The original intention, however, may not have been adhered to.  A party who has executed the paper may waive its execution by some or all of the other parties.  He may do this, although the

instrument was drawn as the joint bond of the parties named in it, and not as their joint and several bond. Where the instrument, fully executed as to one or more of the parties, is found in the hands of the obligee, I think it should be presumed, in the absence of all other evidence on the subject, that it was duly delivered as the deed of those who have executed it. * * * Such a presumption is consistent with the face of the paper, even when it imparts an original intention that others should execute it. To make this presumption in such a case does no injustice to those who have executed the paper. They may still show how the fact really is. They may also protect themselves against any inconvenience that may arise from such a presumption, in the first instance, by taking care to keep the instrument out of the hands of the grantee or obligee until it is fully consummated according to their intention. The obligee or grantee, on the other hand, has full notice from the face of the paper of the original intention of those who signed it, and he can not complain if they are allowed to prove that this original intention was not relinquished in the delivery. It has accordingly been held, in numerous cases, that where an instrument which shows on its face that it was to be executed by other persons besides those who have executed it, is found in the hands of the party to whom it is made, it will be presumed, in the absence of evidence, to have been duly delivered as the deed of those whose names are signed to it."

In the instant case there is no testimony that there was a conditional delivery of this contract. The testimony of Stutz is that this contract, duly signed and sealed by the corporation, was delivered to him unconditionally. On the other had, the testimony introduced by the defendant is to the effect that it was never sealed and was never delivered to Stutz, conditionally or unconditionally. The contract was properly admitted. Whether it had been sealed

and/or delivered by the corporation were questions of fact for the jury.

The second, third and fourth assignments of error relate to the action of the court in giving certain instructions asked for by the plaintiff. The court gave the following instructions. Numbers 1, 2, 3 and 4 were given at the request of the plaintiff, and those designated A, C and D were given at the request of the defendant:

1. "The court instructs the jury that if you should believe from the preponderance of the evidence that the contract in question was entered into between the plaintiff and the defendant for certain services to be performed by the plaintiff and you further believe that said services were performed, then you will find for the plaintiff in the sum of $10,000.

2. "You are further instructed that the failure of Rosenberg Brothers to sign the contract should have no bearing whatever on your decision in this case, unless you further believe that the plaintiff and defendant agreed that the contract should not be binding until it had been signed by Rosenberg Brothers."

A. "The court instructs the jury that if you believe from the evidence that the contract sued on was in the files of the defendant company, and was never delivered to the plaintiff, by an officer of the defendant company, then your verdict should be for the defendant."

C. "The court instructs the jury that if you believe from the evidence that the contract sued on was not to be effective until and unless, the Rosenberg Brothers signed the same, or that said contract was not to be effective until the corporate seal was affixed thereto by its secretary, under resolution of the board of directors, to be called especially for that purpose, and that said board never passed such resolution, then your verdict shall be for the defendant, unless you further believe that the defendant knowingly waived these conditions.

D. "The court instructs the jury that the burden of proving a valid delivery of said contract is upon the plaintiff, and by a preponderance of the evidence, and that if you fail in the proof, your verdict should be for the defendant."

3. "You are further instructed that it is not necessary for the plaintiff in this case to show that a binding contract was entered into by the defendant and Loew, Incorporated, in order for him to recover, because the contract sued upon does not specify that such a contract must have been executed.

4. "You are further instructed that even though you should believe that the seal of the corporation was not placed on the contract by the defendant corporation, through its proper officers, still if you do believe that said contract was properly signed and delivered, you should find for the plaintiff, because the contract in question is not one that the law requires to be under seal."

The second assignment of error is that the court erred in giving instructions numbered 1 and 2. In the language of the record, the objection assigned by the defendant to the giving of these instructions was "that the contract shows on its face that Rosenberg Brothers were a necessary party thereto, and that as a matter of law, the action could not be maintained on said contract in the absence of the signatures of part of the parties bound thereby."

For the reasons stated in discussing the first assignment of error, this did not constitute a valid reason for refusing to give instructions numbered 1 and 2.

The third assignment of error is that the court erred in giving instruction numbered 3. The objection assigned in the trial court to the giving of this instruction was that "it eliminates from the consideration of the jury the question of the necessity on the part of the plaintiff to procure, or assist in procuring, Loew and Company, or a *subsidiary*

*company*, to operate said theatre on a workable basis." (Italics ours.)

■ The instruction may be open to some other objection, but it is not subject to the objection assigned in the trial court, and we cannot here consider objections not made in the trial court.

■ The contract sued upon provides that the services Stutz was to render were services in connection with "procuring, promoting and assisted in financing a theatre to be operated by Loew, Incorporated, or a subsidiary corporation." The defense set up in the grounds of defense was that the plaintiff "failed in procuring a satisfactory lease with *Marcus Loew Booking Agency* so that the project was ultimately abandoned." In the evidence introduced by the appellee it had sought to shift its position, as it has done in the petition for a writ of error, and defend on the ground that Stutz had only procured or assisted in procuring *Marcus Loew Booking Agency*, a subsidiary of Loew, Incorporated, to operate said theatre, when he "was to secure and obtain Loew, Incorporated, to operate the theatre."

Such defense could not be made under the grounds of defense filed by the defendant; and instruction 3 merely tells the jury that in this case it was not necessary for the plaintiff to show that a binding contract was entered into by the defendant and Loew, Incorporated. It did not tell the jury that it was not necessary for the plaintiff to prove that he had procured or assisted in procuring a subsidiary company to operate said theatre.

■ The fourth assignment of error is that the court erred in giving instruction 4. The objection assigned to this instruction was that "it excludes the specific testimony, establishing the fact that the contract was not to be operative until the secretary affixed the seal of the company thereto pursuant to resolutions of the board of

directors, and that the contract has affixed to it the seal of the company; and the statement contained in the instruction that the seal was not required as a matter of law is misleading, and has a decided tendency to say to the jury that whether the plaintiff agreed to wait until the seal was properly affixed, or not, the contract would be binding.''

When read in connection with instruction C, given at the request of the defendant, as it must be, instruction 4 is not, we think, subject to this objection.

■ ■ The fifth assignment of error is that the court erred in refusing to give instruction B offered by the defendant, which reads as follows:

B. ''The court instructs the jury that if you believe from the evidence, under the terms of plaintiff's agreement with the defendant company, that the plaintiff would procure a workable contract from Loew, Incorporated, or a solvent subsidiary of said company, to run the proposed theatre, and failed in procuring such contract, then your verdict should be for the defendant.''

This instruction was rightly refused. It is subject to several serious objections, among others the following:

It in effect instructs the jury that they must find for the defendant if they believe from the evidence that Marcus Loew Booking Agency was not a *solvent* corporation. Not only is the insolvency of Marcus Loew Booking Agency not a defense that could be set up under the grounds of defense filed by the defendant; but there is no evidence in the record which would have warranted the jury in finding that it was not a solvent corporation.

■ In addition to this, it instructs the jury that if they believe from the evidence that Stutz failed to ''procure a *workable* contract from Loew, Incorporated, or a subsidiary'' thereof, then they must find for the defendant. This wholly ignores the testimony of the plaintiff tending to

show that the terms of the contract to be entered into between Marcus Loew Booking Agency and the defendant had been agreed upon between them, and in effect tells the jury that they must find for the defendant if they believe the proposed contract was not a "workable" contract even though its terms may have been agreed upon between the parties.

The sixth and last assignment of error is that the court erred in refusing to set aside the verdict of the jury because of the alleged errors set forth in assignments of error 1 to 5, inclusive, above mentioned, and because it is contrary to the evidence.

As has been said above, the alleged errors of law are not well assigned. There is ample evidence in the record to support the verdict of the jury, and the court correctly refused to set aside the verdict on the ground that it was contrary to the evidence.

*Affirmed.*